## HAYFORD'S APPEAL.

To obtain an issue to try the validity of a will, it is not sufficient merely to
allege want of testamentary capacity ; evidence which would justify the
Court in sustaining a verdict that the testator was of unsound mind is
necessary.

Undue influence must operate upon the mind of the testator, at the time
the will is made.

Upon a demand for an issue to try the question of testamentary capacity,
the Court may hear and consider evidence in support of the will.

Appeal from the Orphans' Court of Northampton County.
No. 156, July Term, 1882.

This was an appeal from an order of the Orphans' Court, re-
fusing to grant an issue to determine whether Dr. Charles
Innes was of sound mind at the time he made an interlineation
in his will ; and whether any imposition had been practiced
upon him. The facts of the case appear in the opinion of the
Court which was delivered May 15, 1882, per

MEYERS, P. J.

On the 6th day of November, 1867, Charles Innes made his
last will and testament, in the third clause of which the testa-
tor, after making a certain devise and bequest to Edward
Innes, his heirs and assigns, in trust for Joseph M. Innes
during his natural life, directs as follows : "And at his death
to pay over the principal sum of said trust to such person or
persons as shall be entitled thereto, under the intestate laws of
the State of Pennsylvania in such shares as is therein provided
in cases of intestates."

On the 25th of November, 1869, the testator, in writing at-
tached to said will, made an alteration in third clause by inter-
lineating, by which the devise and bequest over, upon the
death of Joseph M. Innes, is as follows as interlined : "And at
"his death to pay over the principal sum of said trust to my
"son, Edward Innes, and my daughter, Catharine Seitz, or to
"such person or persons as shall be entitled thereto as their
"legal heirs, under the intestate laws of the State of Pennsyl-
"vania, as herein provided in cases of intestates."

Charles Innes died in 1880, and on the 29th of April, 1880,
the will was admitted to probate and letters testamentary
granted to Edward Innes, the executor therein named. On
the 18th of October, 1880, an appeal from said probate to the

Orphans' Court was entered by Mary Hayford (a grand daughter of the testator) and her husband, James B. Hayford, on the ground that Charles Innes, at the time of executing the alleged will, was not of sound mind, &c., and the execution thereof was procured by fraud, imposition and undue influence.

Joseph M. Innes died on the 20th day of February, 1876, in the lifetime of his father, Charles Innes, leaving to survive him one child, Mary J. Hayford, the appellant.

On the 15th of November, 1881, the appellants by their counsel, presented their petition to the Orphans' Court for an issue to the Common Pleas to try the following facts:

1.—Whether the said Charles Innes, at the time of the execution by him of a certain paper writing, alleged to be a codicil to the last will and testament of the said Charles Innes, deceased, dated the twenty-fifth day of November, A. D. 1869, was of sound and disposing mind, memory and understanding.

2.—Whether the execution of the said codicil by the said Charles Innes, was procured to be made by fraud, imposition, or undue influence.

It was claimed by the contestants that they were entitled to an issue upon the sworn allegation that Charles Innes was of unsound mind on the 25th of November, 1869, and that the execution of the alleged codicil was procured to be made by fraud, imposition and undue influence. We then held, and the authorities are decisive on this question, that they were not entitled to such issue, unless they satisfied the Court by competent testimony of the probable truth of either or both of said allegations. We also held that if the contestants submitted testimony of want of testamentary capacity, or undue influence, or both, the proponents were also entitled to call witnesses to rebut the same. On the last proposition I cannot find any direct authority where the precise question was raised, but the uniform practice is to receive such testimony. In no case where the Supreme Court have affirmed the decision of the Court, refusing to grant an issue, when testimony was submitted by the proponent, is that circumstance alluded to as error in the proceeding, by the Court below.

Under these rulings the contestants and proponents summoned a number of witnesses, and also submitted documentary evidence in support of their respective theories.

The question is what is the rule of law in the examination, discussion and application of the testimony by which to determine whether the contestants are entitled to an issue. The rule as extracted from the authorities is substantially thus: That if the case were submitted to a jury on the same evidence now before the Court, and a verdict rendered in favor of the contestants, which in the opinion of the Court trying the same was warranted by the weight of the evidence, then the contestants are entitled to an issue : but if the verdict ought to be for the proponents, and the jury, nevertheless, rendered a verdict in favor of the contestants which the Court would not be warranted to sustain, then the contestants are not entitled to an issue.

The witnesses examined on behalf of the contestants on the question of the mental capacity of Charles Innes were Jacob Rader, Dr. C. C. Field, Catharine Hay, B. M. Youells, Robert C. Pyle, James R. Innes, Charles Seitz, Edward Innes, Elisha Allis, Dr. Henry D. Lachenour, Mrs. Carrie W. Yohe, and Dr. Joseph Meixell. Mrs. Yohe testified to matters occurring in 1865, but expressed no opinion as to the sanity of Charles Innes at that time or in 1869. James R. Innes, Edward Innes and Joseph Meixell also expressed no opinion. Jacob Rader, Dr. C. C. Field, Charles Seitz, Elisha Allis and Dr. Henry D. Lachenour positively testify that Charles Innes was of sound mind in November, 1869. The only witnesses of the contestants who testify differently are B. M. Youells, Catharine Hay and Robert C. Pyle.

Assuming for the present that Charles Innes was of unsound mind for several months in 1843, and again in 1873 up to his death; that circumstance is of little moment unless the fact sheds some light on his mental condition in November, 1869, when the codicil, was executed or illustrates his conduct, acts and conversation at or near that period. The witness who testifies to the insanity of Charles Innes in 1843 and 1873, most distinctly testifies that shortly after his attack in 1843 he was

fully restored to bodily and mental health; that from that time up to and within a short pe·iod of the date of the codicil he was engaged in an extensive practice as a physician in Easton, and that there was no visible manifestation of the return of the mental malady until about a year before 1873. That during all that time he was a person of sound mind. This is established beyond all question by the testimony of Jacob Rader. To the same effect is the testimony of Dr. C. C. Field, also a witness for the contestants.

It is, however, claimed by the contestants that matters testified to by Dr. C. C. Field, Catharine Hay, B. M. Youells, Robert C. Pyle, Dr. H. D. Lachenour, James R. Innes and Mrs. Yohe indicate unsoundness of mind in Dr. Innes in 1869. It will be therefore necessary to examine their testimony somewhat in detail.

CATHARINE HAY.—It appears that Joseph M. Innes came home from California in 1869, where he had been fifteen years. The witness testifies in substance that Joseph was in the yard; that Dr. Innes walked past him and did not know him until Mrs. Innes, who was upstairs at the window, said : "Don't you know your own child," and then the doctor knew him, and he came out. She thinks that Dr. Innes was not right in his mind, and expressly says that she bases her opinion upon the fact that he did not know Joseph, and that she did not see anything else wrong but that. It does not appear from her testimony under what circumstances Charles Innes and his son met, and whether that was the first time or not when they first met after the return from California, where he had been for the previous fifteen years.

DR. HENRY D. LACHENOUR testifies that he was called in to prescribe for Joseph for rheumatism in 1869, that he saw Dr. Innes at the time and stated to him what remedies he had prescribed, and that the doctor understood it when it was explained to him. The substance of the rest of his testimony is that Dr. Innes was considerably excited, depressed in spirits, averse to holding a conversation and anxious to avoid all excitement; that he comprehended what the witness said. The witness when asked as to his opinion of the condition of the

doctor's mind, said that he did not see anything in Dr. Innes except what would lead him to believe that his mind was simply in a depressed state, and thought that he comprehended what was said when spoken to; but that the witness made no observation at the time of anything whether he had sufficient mental capacity to do business.

R. C. PYLE.—The substance of his testimony is that Dr. Innes had been his family physician for a number of years; that the witness' wife had a child born in February, 1869; that a few days before its occurrence the doctor came to the witness' store, and after a short conversation he told him that he would call on him in a few days about his wife, and the doctor said he did not go out any more; when asked why he said he did not go out any more, that he was unable to attend to anything of that kind, and told me to get another physician. The witness' judgment as to his mental condition, from his observation as to his conversation and conduct, was that his mental faculties were not as good as they had been previously, but whether his mental condition was good enough to transact business, he could not say; he thought that his mental faculties had become impaired from what he had seen of him before, but from the conversation he had, he could not form any judgment whether he was able to manage the ordinary affairs of life or not.

DR. C. C. FIELD.—In the latter part of 1868 the witness and Dr. Innes were riding in a carriage, when the doctor told him that he was not feeling well and thought that he was going to be taken sick again; he also stated that his property had de_ preciated very much in value, and appeared nervous and despondent; they then talked about the value of the property and the witness made him an offer for it, which he declined to accept, stating that he would have to consult his sister first. The witness was of the opinion that his despondency arose from the idea that his property had depreciated in value, but he spoke sensibly and properly, and answered questions intelligently. In February, 1869, the witness called on him to accompany him in a case of obstetrics, stating to him that the case no doubt would be a severe one. He said that he had

ceased to attend to the business, that he did not feel himself fit to attend. He was exceedingly nervous, but his conversation was intelligent and his questions and answers were proper. He finally accompanied the witness after being urged by him and Mrs. Innes; he took great interest in the case, was much depressed by it, and made him very nervous indeed. The patient died and he seemed to regret the result very much and spoke about a post mortem that should be made. The witness testified that he never refused to go with him before in cases of sickness.

The witness when asked whether he noticed any failure in the doctor's mental powers somewhat evaded the question by answering that he was exceedingly nervous, but the questions I put to him in conversations were answered properly, that his disposition was to have as little to do with business as possible, and when the witness visited him afterwards, he did not care about his remaining, and that in this respect he was different from what he had been before, when he was always cordial. After some further questions were put to the witness, he finally answered that he did not observe particularly that there was any failure in Dr. Innes' mental powers or he should not have called on him to accompany him to see Mrs. Depew. When asked when he saw how the doctor was on that occasion whether he did not form an opinion as to his mind, to which the witness replied that he thought he was much more excited than before, but that his remarks to the witness in relation to what might be required were all correct, and were, what is frequently in cases of that character. The witness also testified that in 1873, or thereabouts, he and Dr. Meixell signed a certificate for the doctor's removal to an asylum. He was examined as to his conversation and condition between the time when they visited Mrs. Depew in her illness in 1869 and for several years thereafter, and his testimony is in substance the same as to the doctor's condition in 1869.

MRS. CARRIE W. YOHE.—The substance of her testimony is that in the latter part of May or beginning of June, 1865, Dr. Innes came to her house on Monday about 10 o'clock, A. M., to attend her in confinement and remained in the house until

Thursday evening. While there he asked for brandy, stating that he was dyspeptic; he was informed that they had no brandy but had some whisky, and was informed where it was kept; the result was that by Wednesday the doctor had drank too freely of the whisky and became intoxicated. It was then found to be necessary to call in another physician.

JAMES R. INNES——This witness had been residing in Philadelphia for a number of years; he was well acquainted with Dr. Innes; after the witness came back from Philadelphia to Easton he met Dr. Innes on the street and the latter did not know him. He does not know what year this was; it might have been as late as 1873 or 1874.

B. M. YOUELLS.—This witness knew the doctor for fifty-five years, he was his family physician at one time. The witness is a barber and shaved the doctor from 1857 to 1871; he commenced shaving him in his house in the latter part of 1868 or beginning of 1869; when shaving him at the house, I frequently heard him ask Joseph and others whether they had been to market and had got anything to eat; that he heard Joseph say: "You are all the time troubling yourself about something to eat; just you wait and you will get something to eat;" that he heard Edward say to the doctor: "You bother yourself too much about it, I'll go to market to get you all you want;" that when the witness got to the house the doctor was generally upstairs and Mrs. Innes and Edward had a good deal of trouble with him to come down stairs to dress him and to keep him clean; that the witness heard them say in the doctor's presence that there was trouble to get him to keep himself clean and get him to shave and such things like that; that the doctor would not say much in reply, except sometimes would say: "You need not bother yourself so much about me," but he would not smile or seem to take it as a joke; that he shaved him twice a week, and it seemed about the same thing over; that he never had any conversation with him at these times, except to answer questions; he would never say anything to me nor I to him; that his conduct in former years was entirely different. Upon these state of facts the witness testified that in 1869 Dr. Innes was of unsound mind, that in

his judgment he had not sufficient knowledge of his family and sufficient mental capacity to make a will; that from what he knew of the doctor, being in his company for twenty years, being his physician, and from what he knew about him, he did not think him competent to make a will. On cross-examination he was asked whether he based his opinion on the fact that the doctor said nothing and he said he did not; because the rest said he would not keep himself clean? and he said he did; and if that was all? and he answered, that's about all, nothing else but what he stated here. When asked whether these were all the reasons why the doctor was not fit to make a will at that time, he said it was. The witness did not know how many children Dr. Innes had: he did not know whether the doctor knew how much property he had; that he never talked with the doctor about his property or his children; had no conversation with him except every day business ones. Once in a while he might ask him a question, and when he answered, the answer was as sensible as anybody's; that the doctor paid him for the shaving.

The other witnesses for the contestants, with the exception of three, who expressed no opinion whatever, and Mr. Youells, Mr. Pyle and Catharine Hay, were of the opinion that Dr. Innes was of sound mind in 1869. I shall not refer to their testimony in detail, except to that of Elisha Allis, Esq., who drew the codicil in 1869. This witness is a member of the bar and a nephew of Dr. Innes; he was sent for to draw the codicil and did so; in his testimony he fully and distinctly explains how that was done, who was present and what was said at that transaction. When asked whether he noticed any failure in the doctor, he answered that he thought his failure was mainly bodily, as he never noticed any mental failure. When asked whether he thought his mind was as strong at that time as it had been before, he answered that it is a very difficult question to answer, because mental weakness follows so closely upon and is so closely connected with bodily weakness. On cross examination he testified that he considered the doctor at that time to be of sound disposing mind, memory and understanding, and should not have touched it if he had not thought so.

In November, 1869, Dr. Innes was 67 years old.   The testimony is that he was a man of a most excellent character and of more than ordinary intelligence and intellectual force.   He was, however, to some extent, a timid man, which accounts to some extent for his nervousness as he grew older.   His health evidently began to fail before 1869.   A careful examination of the testimony as presented by the contestants; the doubtful propriety of allowing some of the witnesses to express an opinion as to the mental soundness of Dr. Innes in November, 1869, renders it extremely doubtful whether upon the contestants' testimony they are entitled to an issue as to Dr. Innes' testamentary capacity.   Less mental capacity is required to make a will than to make a contract; mere mental weakness arising from old age or disease, even if accompanied with foolish utterances and conduct, is not enough to take away testamentary capacity, unless it is shown that the mind of the person is affected to such a degree as to deprive him of an intelligent consciousness of the nature and effect of his act, a knowledge of the property he possessed and an understanding of the disposition he intended to make of it.   The presumption is that the testator was of sound mind on the 25th of November, 1869, and the burden is on the contestants to satisfy the Court that there is reasonable ground of belief that he was of unsound mind on that day.   Testing this case by these elementary principles and the rule heretofore laid down, and applying the same to the testimony submtited by the contestants and the proponents, the conclusion is irresistable that the great weight of the testimony is in favor of the testamentary capacity of Dr. Innes on that day.   It is needless to refer to the testimony of the proponents at great length.   The witnesses are W. H. Thompson, M. H. Jones, Esq., W. H. Hutter, John N. Linden, William H. Gerspach, John D. Wagener, William Keller, William Parks and Dr. George W. Lott.   They all testify to conversations and business transactions except Dr. Lott, with Dr. Innes, during the year 1869 and before and after, of more or less importance, and that in their opinion he was of sound mind in November, 1869.   No one, of all the witnesses examined in this proceeding had better opportunity to know and fully understand and measure the mental condition

of Dr. Innes than Mr. Jones. He was his brother-in-law, they had valuable real estate in common, and Mr. Jones as an attorney and personal friend was his confidential and professional adviser. The intelligence and great experience of the witness and the other circumstances already referred to rendered him peculiarly competent to form a just and correct estimate of Dr. Innes' mental capacity; they had business dealings with each other during the time it is alleged that Dr. Innes was of unsound mind; he loaned him money, and had almost daily intercourse with him, either of a business of friendly character. The checks, receipts and leases made and given by Dr. Innes, and which were given in evidence, showing that he attended to his own business affairs. What have we then in these proceedings? Of the contestants' witnesses, Jacob Rader, Dr. C. C. Field, Dr. Henry L. Lochenour, Elisha Allis, (who drew the codicil) and Charles Seitz, and all the proponent's witnesses, including Mrs. Schott (who is one of the subscribing witnesses to the codicil) testify with more or less clearness and positiveness that Dr. Innes was of sound mind in November, 1869. In addition to this is the documentary evidence already referred to. Against all these we have the testimony of Mr. Youells, Mr. Pyle, Catharine Hay, James R. Innes and Mr. Leidy. I have already referred to their testimony except that of Mr. Leidy, whose testimony refers to 1871. To submit this codicil to the jury upon such testimony on the question of testamentary capacity, would but only be a waste of time as said by Gibson J., but would be trifling with the administration of justice. Testamentary capacity is nowhere better defined than by Judge King in Leech vs. Leech, 21 Pa., 69, and affirmed by the Supreme Court, and "is a full and intelligent consciousness of "the nature and effect of the act the testator was engaged in; a "full knowledge of the property he possessed; an understanding "of the disposition he wished to make of it by the will, and of "the persons and objects he desired to participate in his bounty." In this case the testator has knowledge of his property, as appears by the testimony of Dr. Field and Mr. Jones. This knowledge was not absolutely essential here, because it was not the intention of the testator to dispose of his entire estate in 1869, but only to change the disposition of Joseph's share

3 Wa 6

after his death. That a'l the other elements were present in his mind there can be no doubt. In 1867 he intended to give Joseph only a life estate. In 1869 that intention was still present. In 1867 he gave Joseph's share after his death to his heirs according to the intestate laws. In 1869 he wished to make a change in that respect, and this fact itself shows that he was conscious of the disposition he had made of it in 1867. If he was conscious of that fact, then he must have comprehended the effect of giving Joseph's share after his death to the testator's other children by name, or other heirs according to the intestate laws.

He and Mr. Allis talked of the propriety of preparing a codicil or making the change by interlineations. The doctor preferred interlineations. After it was done the clause was read to him, with the interlineations, and he said: "That will do, that is the way I wanted it." Who can say that he did not understand it, and that he did not know that was what he wanted? Would a jury have a right from the testimony before the Court to say so? We think not.

The ground upon which it is claimed that the codicil in 1869 was made by undue influence, fraud, &c., is (1) the declaration made by Mrs. Innes in the presence of the testator, at the time the codicil was made; (2) the will as made in 1867, and his declared intention at that time.

"Undue influence, in the general sense, is that dominion ac- "quired by any person over a mind of sanity for general pur- "poses, and of sufficient soundness and discretion to regulate "his affairs in general, which prevents the exercise of his dis- "cretion and destroys his free will;" 1 Cox, case 355. "A "testator should enjoy full liberty and freedom in the making "of his will, and should possess the power to withstand all "contradiction or control. That degree, therefore, of importu- "nity or undue influence which deprives a testator of his free "agency, which is such as he is 'too weak to resist, and will "render the instrument not his free and unconstrained act," is "sufficient to invalidate it." * * "It is not every degree of "importunity that is sufficient to invalidate a will or testament. "Honest or moderate intercession or persuasion, or flattery, un-

"'accompanied by fraud or deceit, and where the testator has "not been threatened or put in fear by the flatterer or per-"suador, or his power or dominion over him, will not have the "effect ; 1 Jarman on Wills, 36-37. "Undue influence may be "either through threat or fraud ; but however exercised, it "must, in order to void a will, destroy the free agency of the "testator at the time when the instrument is made ;" Eckert vs. Flowry, 7 Wr. 46. "It must be a present, constant, opera-"ting on the mind of the testator in the very act of making "the testament ;" McMahon vs. Ryan, 8 H, 329.

The situation and circumstances surrounding the party affected by the changing of the will, at that time are these : Mary J. Hayford is the daughter of Joseph M. Innes, deceased, and a granddaughter of the testator. Joseph was married about 1850, and in 1854 he, his wife and daughter, who was then about four years old, went to California. In 1859 his wife died, and his daughter afterward resided with her maternal relatives. Joseph came back from California in 1869, shortly afterwards returned to California, where he died in 1876. When his daughter went to California she was but a mere child, and that was the last time that the testator saw her. When the alteration in the will was made, and after the testator had given directions to Mr. Allis how he wished it changed, Mrs. Innes, the wife of the testator, in his presence, remarked "that Joseph's family had not treated him right, or as they should." The witness, Mr. Allis, does not recollect which of these phrases she used. Upon cross examination he said that the doctor sat right by her side when she made this remark, and that he replied, "Joseph is my son, I want him to have his share during his life, and after his death I want those here to have it." Assuming that this had been said to the testator by some one before Mr. Allis was called in to make the alteration, it does not follow that it was stated to him by Mrs. Innes. In the order of time in which it was said by Mrs. Innes, when the alteration was about to be made, this was after the testator had already given his instructions. Whether it was the purpose of Mrs. Innes, in doing so, to confirm her husband in his determination to change his will in the way he did, or for some other purpose, cannot positively be determined

from the testimony. The prompt and emphatic reply of Dr. Innes seems to indicate that she may have known the reasons why her husband intended to make the change, and that she was prompted to make the remarks so as to incite discussion and induce him to abandon his purpose. Be that as it may, there is not a scintilla of evidence that any undue influence or coercion was used by Mrs. Innes at that time or before. The probability is that this information was given to the testator by his son Joseph, but when, how, or under what circumstances it was done, we have no means of knowing, or whether it was done for the purpose of influencing his father to change his will. There is some little testimony by one or two witnesses that they had heard from some source, but not from Joseph, that he had endeavored to persuade his father to change his will. Of course this testimony being only hearsay, cannot be considered. It is, however, claimed that a fraud was practiced on the testator, and that in this way he was coerced in changing his will. That it is not true Joseph's family did not treat him well or as they should, for the reason that when his wife died in 1859, his daughter was but a child, and that such treatment could not have come fom her; that after that time strictly speaking, he had no family, because his daughter lived with her friends, and to entitle the Court to give it the effect claimed by the contestants, it is necessary that we should know precisely what was said, and when he referred to his family, whether he spoke of it as it was constituted before the death of his wife, or whether he referred to the family where his daughter was after her mother died, and whether he considered himself a part of the same. To whatever relationship he may have referred in order to constitute it as a basis of fraud and moral coercion on his part, it is absolutely necessary that we should have evidence of the language used by him, the mode in which it was communicated to his father, as well as the purpose and utter falsity of the statement. In the absence of such evidence we have no right to suppose, much less to say, that the change in the will was made by means of undue influence, fraud or imposition. That the effect of the change in the will not only deprives the contestant of her legacy under the will of 1867, and of all participation in the estate of her

grandfather is quite plain.    When a testator gives his estate to strangers, to the exclusion of his own blood, that circumstance is corroborative evidence of undue influence, when there is some evidence of that fact.    This is not the case here.    For these reasons we cannot grant an issue to the contestant upon the question of the testamentary capacity, or of undue influence, fraud or imposition.

And now, May 15, 1882, issue refused, appeal dismissed and costs of this proceeding directed to be paid by appellant.

Mary J. Hayford then appealed, complaining of the refusal of the Court to grant the issue prayed for; and in hearing evidence of the appellees in favor of the will.

*Messrs. E. J. Fox and Son and D. W. Nevin, Esqs.*, for the appellant, cited Cozzen's Will, 61 Pa., 199 ; Colgate's Estate, 5 W. N. C., 170 ; Wilson's Appeal, 11 W. N. C., 333 ; Gibson's Estate, 11 W. N. C., 355.

*W. S. Kirkpatrick and B. F. Fackenthall, Esqs., contra,* argued that an issue in the Orphans' Court is not a matter of right, but the contestants must make out a *prima facie* case ; Harrison's Appeal, 12 W. N. C., 17; Cauffman vs. Long, 82 Pa., 72.    As to mental capacity they cited Wilson vs. Mitchell, 12 W. N. C., 441 ; Daniel vs. Daniel, 39 Pa., 191 ; Tawney vs. Long, 76 Pa., 106 ; Leech vs. Leech, 21 Pa., 67; Stevens vs. Vancleve, 4 Wash. C. C., 262 ; Lowe vs. Williamson, 1 Green Ch., 82 ; Van Alst vs. Hunter, 5 Johns Ch., 148; Boyer's Will, 13 Phila., 256.    The Court was right in hearing evidence in support of the will ; Clendaniel's Estate, 13 Phila., 248 ; Boyer's Will, 13 Phila., 254; Harrison's Appeal, 12, W. N. C., 20.

The Supreme Court affirmed the decree of the Orphans' Court on March 19th, 1883, in the following opinion,

PER CURIAM.

The review of the evidence by the learned judge fully justifies the conclusion at which he arrived.    The reasons given in his full and able opinion present sufficient grounds for refusing the issue.

Decree affirmed and appeal dismissed at the costs of the appellant.